AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the

Western District of New York

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| *(Briefly describe the property to be seized)* | ) |
| ONE 2017 FORD F150; NY REG. | )   Case No.  22-MJ-~~0573~~ |
| 150ROUSCH, VEHICLE IDENTIFICATION | )            4047 |
| # 1FTEW1EFXHFC9224 | ) |
| | ) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the <u>Western</u> District of <u>New York</u> is subject to forfeiture to the United States of America under <u>21</u> U.S.C.

Sections 853(a)(1) and (a)(3), and 881(a)(4)

*(describe the property)*:

One White 2017 Ford F-150 XLT, NY REG. 150ROUSCH Vehicle Identification # 1FTEW1EFXHFC9224

The application is based on these facts:

**See attached Affidavit of Special Agent, Stephen J. Csapo, Federal Bureau of Investigation (FBI)**

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Stephen J. Csapo, Special Agent, FBI
*Printed name and title*

Application submitted electronically by email in .pdf format. Oath administered, and signature attested to me as true and accurate telephonically pursuant to Fed R. Crim P. 4.1 and 41(d)(3).

Date: May 9, 2022

City and state:  Rochester, New York

_____
*Judge's signature*

Hon. Marian W. Payson, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

IN THE MATTER OF THE SEIZURE OF:

ONE 2017 FORD F150; NY REG. 150ROUSCH,
VEHICLE IDENTIFICATION # 1FTEW1EFXHFC9224
_____

## AFFIDAVIT IN SUPPORT OF  SEIZURE WARRANT

STATE OF NEW YORK    )
COUNTY OF MONROE    )        ss:
CITY OF ROCHESTER    )


Stephen J. Csapo, being duly sworn, deposes and states:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served in that capacity since (September 2015).  I have received training on the elements of various financial crimes in violation of U.S. Federal Law, have investigated numerous financial schemes and executed arrests and search warrants during the course of these investigations. I am assigned to the White Collar Crime (WCC) squad in the Buffalo Division of the FBI, and I am currently assigned to the Rochester Resident Agency.  Said Squad maintains investigative responsibility for matters involving Securities Fraud, Bank Fraud, Mail Fraud, Corporate Fraud, Heath Care Fraud, Public Corruption, as well as other matters. During my employment as a Special Agent with the FBI, I have drafted and executed numerous legal affidavits.

## PURPOSE OF AFFIDAVIT

2.      This affidavit is submitted in support of an Application for a Civil and Criminal Seizure Warrant pursuant to Title 21, United States Code, Sections 853(a)(2) and 881(a)(4)

for: One WHITE 2017 FORD F-150 XLT, VIN: 1FTEW1EFXHFC9224, BEARING NEW

YORK LICENSE PLATE NO: 150ROUSCH, registered and titled to RALPH R. MINNI

(hereinafter referred to as "**SUBJECT VEHICLE**").  I state that there is probable cause to

believe that the **SUBJECT VEHICLE** was used, or intended for use, to transport, or in any

manner to facilitate the transportation, sale, receipt, possession, or concealment of controlled

substances in violation of Title 21, United States Code, Chapter I of Subchapter 13, Section

801 et. seq.

## BASIS OF KNOWLEDGE

1.      I am familiar with the facts and circumstances surrounding this investigation,

both through my personal participation in this investigation and from information provided

by other law enforcement officials.  Because this affidavit is being submitted for the limited

purpose of securing a seizure warrant, I have not included every fact known to me concerning

this investigation.   In support of this application, I submit and rely upon the Criminal

Complaint, Case No. 22-MJ-0572, signed and filed by Brendan M. Boone, Special Agent,

United States Postal Service, Office of Inspector General and signed by the Honorable Mark

W. Pedersen, on April 15, 2022, attached hereto as Exhibit 1 and fully incorporated herein.

## SUBJECT VEHICLE

2.      The **SUBJECT VEHICLE** is registered to RALPH R. MINNI (hereinafter

"MINNI"), 12 Kimbrook Circle, Rochester, New York 14612 (hereinafter referred

"SUBJECT RESIDENCE").

## BACKGROUND OF INVESTIGATION

3.     Based on the facts and circumstances of this investigation, as set forth in Exhibit 1 and below, there is probable cause to believe that MINNI, GRACE LOPEZ**,** and others have committed, are committing, and will continue to commit violations of federal law involving the possession with intent to distribute, and distribution of, controlled substances, in violation of 21 U.S.C. § 841(a)(1); and conspiracy and attempt to possess with intent to distribute, and to distribute, controlled substances, in violation of 21 U.S.C. § 846.

**4.**     Additionally, based upon the investigation in this case, there is probable cause to believe that MINNI is using the **SUBJECT VEHICLE** in connection with the commission of his illegal narcotics activities.  On numerous occasions, agents have identified MINNI as the driver of the **SUBJECT VEHICLE**.

## SUBJECT VEHICLE UTILIZED IN CONNECTION WITH COMMISSION OF ILLEGAL NARCOTICS ACTIVITES

### June 13, 2019

5.     On June 11, 2019, CS-3 advised your affiant that he had just spoken to LOPEZ and that LOPEZ and MINNI were ready to sell pounds of marijuana to CS-3.  CS-3 thought that LOPEZ indicated that MINNI had just received six (6) pounds in the mail.

6.     On June 13, 2019, agents met with CS-3 and provided him/her with detailed instructions on how to conduct the controlled purchase of four pounds of marijuana from LOPEZ.  Agents provided CS-3 with a body recorder and $8,600.00 for the purchase.

7.      On June 13, 2019, at 3:45 p.m., surveillance was initiated in the vicinity of 365 Rosewood Terrace.   At 4:23 p.m., agents observed CS-3's vehicle turning onto Rosewood Terrace.   At 4:46 p.m., agents observed CS-3's vehicle departing the vicinity of 365 Rosewood Terrace.   At 5:10 p.m., LOPEZ was observed in her black Honda Accord leaving the vicinity of 365 Rosewood Terrace.   At 5:38 p.m., agents observed LOPEZ's vehicle parked in the driveway of the SUBJECT RESIDENCE".

8.      On June 13, 2019, agents met with and took custody of the marijuana from CS-3.  The marijuana was packed in four individual vacuum sealed Food Saver bags and enclosed in a cardboard box.  The picture and detailing of the cardboard box indicated that it had originally contained an "Ion Sport" portable speaker.  The marijuana appeared green and leafy.

9.      After reviewing CCTV footage from the vicinity of the SUBJECT RESIDENCE the following observations were made:

| DATE | TIME | OBSERVATIONS |
| --- | --- | --- |
| 06/10/19 | 7:11 PM | MINNI and LOPEZ arrived at the SUBJECT RESIDENCE in the black Chrysler 300.  MINNI retrieved a box from the trunk and they both walked to the front of the SUBJECT RESIDENCE.  The box was identical to the Ion Sport portable speaker box that the marijuana was contained in. |

| | | |
|---|---|---|
| 06/11/19 | 10:47 AM | LOPEZ pulled into MINNI's driveway. MINNI exited the SUBJECT RESIDENCE, walked to the **SUBJECT VEHICLE** and gets a large brown box out of the back driver's seat. He then returned to the SUBJECT RESIDENCE through the side garage door. |
| 06/12/19 | 6:31 AM | LOPEZ exited the SUBJECT RESIDENCE with a box that she placed in the trunk of her vehicle.  She entered her vehicle and departed.  The box was identical to the Ion Sport portable speaker box. |

10.     Based upon my training, experience, and knowledge of the investigation, I believe that on the June 10, 2019 entry above, MINNI and LOPEZ actually purchased an Ion Sport portable speaker.  Further, I believe that the June 11, 2019 entry depicts MINNI arriving home with a box/shipment of marijuana.  I base this on the observations from the CCTV as well as the contact from LOPEZ to CS-3 on this same date advising CS-3 that they were ready to sell pound quantities to CS-3 and that MINNI had just gotten a shipment in.  Finally, I believe that the June 12, 2019 entry depicts LOPEZ departing the SUBJECT RESIDENCE with the Ion Sport portable speaker box which now contains the marijuana that LOPEZ sold to CS-3 on June 13, 2019.

11.     I have reviewed the recording made by CS-3 during the transaction which reveals that during the meeting, LOPEZ advised that MINNI's connection in California told MINNI that they are cracking down on the people in California and that he wouldn't be able

to send the marijuana as often.  MINNI's connection told MINNI to bring a U-Haul to California to pick up a large quantity. MINNI and LOPEZ have already started making plans to do that.  LOPEZ stated that they have been coming up with a story to use if they get stopped by the cops. She advised that nobody knows how MINNI makes money and that they think he bullies people into paying debts.  She said, "He comes to work with a suit and tie on, that smile on his face, he waiting for that package." She also said, "That's how I want to do it because I'm gonna be a big ass boss at the post office and it's gonna be even crazier."

## March 13, 2020

12.     On March 10, 2020, at approximately 11:02 am, LOPEZ called CS-3 and advised him/her that MINNI has two pounds of marijuana ready for CS-3 to purchase.  A review of records from AT&T confirm that a voice call between CS-3's phone number and the LOPEZ PHONE occurred at this time. This call was not recorded, and on March 11, 2020, the day after LOPEZ called CS-3, CS-3 contacted your affiant. At my direction, CS-3 advised LOPEZ that he/she could make the purchase on March 13, 2020, and both CS-3 and LOPEZ agreed to conduct the transaction in the vicinity of the Seneca Park Zoo.

13.     On March 13, 2020, agents met with CS-3 and provided him/her with detailed instructions regarding the controlled purchase of two pounds of marijuana from LOPEZ. Agents placed a recording device on CS-3 and provided CS-3 with $4,600.00 for the purchase.

14.     On March 13, 2020, surveillance was initiated in the vicinity of the Seneca Park Zoo.  Additionally, members of the investigative team were watching CCTV coverage of the

SUBJECT RESIDENCE. At 4:53 p.m., LOPEZ exited the SUBJECT RESIDENCE, carrying a brown box and entered her Honda Accord and departed from the SUBJECT RESIDENCE. At 5:09 p.m., agents observed LOPEZ park her vehicle alongside CS-3's vehicle and enter the vehicle. At 5:37 p.m., agents observed LOPEZ exit CS-3's vehicle and enter her Honda Accord. At 5:45 p.m., agents observe LOPEZ departing the Seneca Park Zoo area. Upon reviewing CCTV coverage after the surveillance was terminated, agents observed LOPEZ arriving back at the SUBJECT RESIDENCE at 6:12 p.m. LOPEZ exited her vehicle and walked to the SUBJECT RESIDENCE with a dark bag.

15.     On March 13, 2020, agents took custody of the marijuana from CS-3. The marijuana was packaged in two clear Ziploc baggies inside of a brown cardboard USPS box. The total package weight was 2.3 kilograms and the marijuana was green and leafy and had a strong marijuana odor.

16.     I have reviewed the content of the body recorder and observed, among other things, the following:

17.     LOPEZ said that they are bringing in smaller boxes and that they had to put the marijuana in Ziploc baggies. She said that they are getting in many kinds of marijuana. She stated that "he sold some yesterday" and it was clear from the conversation that she was referring to MINNI. She told CS-3 that MINNI could be making more money selling drugs, but instead is selling to his brother and others. LOPEZ said, referring to MINNI, that "You're sitting on a goldmine getting pennies out of it because you're being for one, extra precautious,

which there's ways to get around that shit especially if you're getting it through.  Second of all, I got mad people I could be selling it to, but you want to be so fucking paranoid and shit, like you're selling it to cornballs, like nah my nigger, like your brother."  LOPEZ said that MINNI got lucky because someone who he knew from Rochester moved to California and that this person is now his connection.   LOPEZ told CS-3 "I was like, let me get a hold of your connect.  Let me travel to, I'll drive to fucking California myself.  I don't have to bring anything back.  Let me have conversations with him so we can make some shit happen…"  LOPEZ later said to CS-3, "what happened was, someone moved to California that he knew.  It's like you moving to California, I still up here and ya start sending me pounds and I'm moving them.  Ya know what I mean?  That's pretty much what he's doing"  LOPEZ then discusses how she is going to launder the proceeds.  She says that her eyelash business is going to be her "filter."  She believes she can filter $30K through her eyelash business and another $30K-$40K through the post office.  LOPEZ said, "So that's about $60K a year I can get through saying it's at least legal money that I could make extra and spending, but I'm pretending that it's coming from my shit."

18.    Your affiant and an agent from the USPS-OIG reviewed CCTV coverage in and around the Greece, NY branch of the USPS from March 11, 2020, and observed the following:

9:08 am     MINNI carries what appears to be a white priority box into his office and within a minute exits his office without the box.

9:09 am     MINNI returns to his office.

9:10 am     MINNI leaves his office with the white priority box.

9:13 am        MINNI returns to his office with an empty tan/brown box.

9:14 am        MINNI leaves his office with a sealed tan/brown box.  The box appears to be identical to the one he had brought into his office that was empty.

9:14:51 am    MINNI carries the tan/brown box to his vehicle and places it in the **SUBJECT VEHICLE**.

10:59 am       MINNI departs USPS in the **SUBJECT VEHICLE**.


19.     Your affiant then reviewed CCTV coverage from that same day that was recorded in the vicinity of the SUBJECT RESIDENCE, which shows MINNI arriving home at 11:04 am and carrying a box to the SUBJECT RESIDENCE.  Based upon my training and experience, the expertise of the USPS-OIG, and the information above, I believe that MINNI received a quantity of marijuana at the Greece, NY branch of the USPS on March 11, 2020 in a priority box.  MINNI brought the box into his office and re-packaged the content into an empty tan/brown box and then brought the tan box (filled with marijuana) to the SUBJECT RESIDENCE.  On March 13, 2020, that same tan box containing two pounds of marijuana was sold to CS-3 by LOPEZ.  It should be known that CCTV coverage showed significant detail of the tan box and the size and markings on the box appeared identical to the box of marijuana that your affiant took custody of following the controlled purchase.

## June 5, 2020

20.     On May 30, 2020 at approximately 7:15pm, in a call recorded by CS-3, CS-3 called LOPEZ at 585-397-2914 (LOPEZ PHONE) and spoke to LOPEZ.  A review of records from AT&T confirm that a voice call between CS-3's phone number and the LOPEZ PHONE occurred at this time. Among other things discussed, CS-3 told LOPEZ "you got to play that

9

part and get that plug…and fly out with that nigger to Cali…".  CS-3 then tells LOPEZ "my man be hitting me up too…My man from here be hitting me up, and be asking me what's good with your ass."  LOPEZ said "oh, ok. I'll talk to him and see what." Later in the conversation, LOPEZ asked CS-3 "how much is he looking for?" and CS-3 said, "two." Based on my training, experience, and participation in this investigation, I know that the term "plug" is used to refer to an individual's source of supply for narcotics.  Further, the reference to California is consistent with other information that has been learned through this investigation, and that indicates that MINNI's source of supply is in California.  Further, based on my training, experience and participation in this investigation, I believe that LOPEZ and CS-3 were discussing the sale of 2 pounds of marijuana, and that when LOPEZ referred to talking to "him", she was indicating she would discuss with MINNI obtaining the marijuana to complete the sale.

21.    On June 4, 2020, at 8:14 am, the LOPEZ PHONE (585-397-2914), called MINNI's PHONE.  At 8:23 am, the LOPEZ PHONE (585-397-2914) sent CS-3 a text message which said, "Got that for your boy."  A review of records from AT&T confirm that a text message between CS-3's phone number and the LOPEZ PHONE occurred at this time. At 2:51 pm, MINNI returned to the SUBJECT RESIDENCE and retrieved a cardboard box from the **SUBJECT VEHICLE** and took it into the SUBJECT RESIDENCE.   At approximately 3:01 pm, LOPEZ**,** using the LOPEZ PHONE (585-397-2914), returned a call to CS-3[1] and asked CS-3 if he/she had gotten her text messages and then asked CS-3,"you

---

[1] This call was also recorded by CS-3, although the very beginning of the conversation was not recorded.  From my listening to the call, I recognize the voice as that of LOPEZ.  Further, A review of records from AT&T confirm that a voice call between CS-3's phone number and

ready?" She told CS-3 that "she can make that move at 11" if it is near her work. At 8:19 pm, LOPEZ was observed walking from the SUBJECT RESIDENCE to her car, where she put a couple of bags in the trunk and departed.

22.　Your affiant has reviewed the content of the body recorder used by CS-3 during the controlled purchase and which shows, among other things, that LOPEZ agreed to the price stated by CS-3 when CS-3 said, "19 and 19" or 38. This refers to the cost of $1900.00 per pound. LOPEZ said, "They are both the same" referring to the individual two quantities of marijuana that she sold to CS-3. LOPEZ told CS-3, "Now he's trying to be consistent. He definitely got a few other one's coming. Do you want that when it gets here? It might get here in the next couple of days. " She further stated, "He doesn't trust nobody, that is his problem. He is afraid everything will be traced back to him." Finally, LOPEZ stated, "I want to encourage a trip to Cali even if it is for me and hopefully we can meet his guy there. I'm gonna see if I can give him some money to send something to a different address."

23.　Based upon my training and experience, I believe that the box that MINNI returned to the SUBJECT RESIDENCE with on the same date contained quantities of marijuana and that when LOPEZ departed the SUBJECT RESIDENCE that evening, she had the two pounds of marijuana with her and secured it in her trunk. Based upon the statements made by LOPEZ at the time of the controlled purchase, she is telling CS-3 that MINNI is trying to be consistent [with the incoming shipments of marijuana] and that he has other one's [packages of marijuana] coming in the near future.

---

the LOPEZ PHONE occurred at this time.

11

**MINNI'S DRUG TRAFFICKING ACTIVITIES CONTINUING INTO 2021 AND HIS
CONTINUED USE OF HIS OFFICE AT THE GREECE, NY POST OFFICE TO
FURTHER HIS NARCOTICS ACTIVITIES**

24.    On numerous occasions during the investigation, MINNI has been observed at the Greece Post Office removing packages from the post office floor and taking them into his private office.  Later, he emerges with a package – sometimes one that appears to have been repackaged – and takes the package to his personal vehicle (the **SUBJECT VEHICLE**) in the Greece Post Office parking lot, and then drives off.  There is no apparent legitimate business reason for these actions, and postal records show that on days referenced in this affidavit when MINNI engaged in this conduct, no parcels were being delivered to the SUBJECT RESIDENCE (which is within the area covered by the Greece Post Office).  Indeed, the investigation has revealed that MINNI intercepts parcels coming through the Greece Post Office that contain narcotics and uses this as a method to obtain his narcotics through the U.S. Mails. The following section describes some such occasions where MINNI was observed engaging in this conduct, using Postal and/or outdoor pole cameras, collectively referred to as "CCTV coverage".

25.    On January 15, 2021, at 7:32 am, CCTV within the Greece Station captured MINNI entering his office with a white Priority box from the sorting area of the Greece Station.  At 8:15 am, MINNI entered his office with a large brown cardboard box.  At 8:39 am, MINNI entered his office with what appeared to be an empty cardboard box.  At 8:40 am, MINNI exited his office with a sealed brown cardboard box.  The GPS tracking device indicated that the **SUBJECT VEHICLE** departed the Greece Station just prior to 11:04 am

12

and arrived at the SUBJECT RESIDENCE at 11:05 am.  CCTV coverage of the SUBJECT RESIDENCE captured MINNI exiting the **SUBJECT VEHICLE** with a box and taking it to the SUBJECT RESIDENCE.  MINNI then departed the SUBJECT RESIDENCE at 11:21 am in the **SUBJECT VEHICLE** and the GPS tracking device showed MINNI arriving at a suspected co-conspirator's address at 11:32 am.  At 11:36 am, MINNI departed this residence and returned to the Greece Station.  Based upon my training and experience and knowledge of this investigation, I believe that MINNI retrieved a package(s) from the sorting area of the Greece Station and brought it into his office to re-package and take back to the SUBJECT RESIDENCE.  Further, I believe that the content of the package(s) contained narcotics and that MINNI traveled from the SUBJECT RESIDENCE to his co-conspirators residence to conduct a criminal transaction.

26.    On March 3, 2021, at 12:10 pm, CCTV coverage in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**.  MINNI exited the **SUBJECT VEHICLE** and retrieved a large brown box from the rear compartment and carried it to the SUBJECT RESIDENCE.  At 2:27 pm, a burgundy Acura sedan identical to the one known to be driven by a suspected co-conspirator arrived in the driveway AT the SUBJECT RESIDENCE, and the male driver walked to the SUBJECT RESIDENCE.  At 2:35 pm, the driver exited the backyard area of the SUBJECT RESIDENCE with MINNI, and he was carrying a bag which he placed in the rear compartment of the **SUBJECT VEHICLE** behind the front passenger seat.  He then departed. Based upon my training and experience and my knowledge of this investigation, I believe that the large brown box that MINNI had arrived to the SUBJECT RESIDENCE with earlier in

13

the day contained a quantity of narcotics.  Further, I believe that the suspected co-conspirator

et with MINNI at the SUBJECT RESIDENCE for the purpose of purchasing a portion of

these narcotics.

     27.    On March 17, 2021, at 10:44 am, CCTV coverage in the vicinity of the

SUBJECT RESIDENCE captured MINNI returning the SUBJECT RESIDENCE in the

**SUBJECT VEHICLE**. The GPS tracker on the **SUBJECT VEHICLE** indicated that his prior

stop had been at the Greece station.  MINNI exited the **SUBJECT VEHICLE**, opened the

door to the rear compartment and retrieved what appeared to be a large brown box which he

took to the SUBJECT RESIDENCE At 6:02 pm, a gray cargo truck pulled into the driveway

and the white male driver exited the vehicle and walked to the SUBJECT RESIDENCE.  At

6:10 pm, the driver returned from the SUBJECT RESIDENCE with a large brown cardboard

box.  The driver opened the passenger side sliding door and placed the box in the vehicle

before departing.  Based upon my training and experience and knowledge of this case, I

believe that the cardboard box that MINNI arrived at the SUBJECT RESIDENCE with early

in the day contained a quantity of narcotics and that he had received these narcotics through

the Greece station.  I further believe that the individual who arrived that evening, met with

MINNI for the purpose of obtaining all the narcotics or a quantity of them.  I base this belief

on the following:  this individual met with MINNI on the day that MINNI returned to the

SUBJECT RESIDENCE from the Greece station with a cardboard box; he stayed at the

SUBJECT RESIDENCE for only 8 minutes; and he exited the SUBJECT RESIDENCE with

a box that looked very similar to the one MINNI had brought to the SUBJECT RESIDENCE.

28.     On April 29, 2021, the GPS tracker on the **SUBJECT VEHICLE** indicated that MINNI was at the Greece Station from 6:32 am to 8:37 am.  At 7:42 am, CCTV in and around the Greece Station captured MINNI carrying a USPS tub with a brown box inside to his office.   At 7:53 am, MINNI carried the USPS tub with what appeared to be a box inside to the **SUBJECT VEHICLE**, where he placed the tub with the box in the rear compartment of the **SUBJECT VEHICLE**.   At 8:38 am, CCTV coverage in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**.   MINNI appeared to remove something from the rear compartment of the **SUBJECT VEHICLE** and then walked to the SUBJECT RESIDENCE.  On April 30, 2021, at 5:32 pm, CCTV coverage in the vicinity of the SUBJECT RESIDENCE captured a silver Charger identical to the one known to be driven by a suspected co-conspirator arriving at the SUBJECT RESIDENCE.  At 6:32 pm, this individual departed.  Based upon my training, experience, and knowledge of this investigation, I believe that MINNI secured a box containing a quantity of narcotics from the Greece Station.  I believe that MINNI transported the narcotics to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE** and then conducted a narcotics transaction with another individual the following day.


29.     A special agent assigned to the United States Postal Service Office of Inspector General who oversees investigations within Western New York advised that MINNI was on authorized leave from May 24, 2021 through July 12, 2021.  This information was consistent with a daily review of CCTV coverage in the vicinity of the SUBJECT RESIDENCE.  Due to his time away from the Greece postal station, there were no observations of him inside of the station removing boxes and taking them to his residence.

15

30.     On July 20, 2021, at 10:52 am, CCTV coverage in the vicinity of the Greece Station captured MINNI carrying a white box from the workroom floor into his office.  At 10:55 am, MINNI exited his office with a white box and walked toward the same area that he had removed the white box from earlier.  At 11:00 am, MINNI returned to his office carrying nothing.  At 11:02 am, MINNI left his office empty handed and then returned to his office with an empty brown box.  At 11:11 am, MINNI removed a brown box and a white or gray package from his office.  He walked immediately to the **SUBJECT VEHICLE** and entered the driver's side with the packages.  At 11:12 am, MINNI departed the Greece Station in the **SUBJECT VEHICLE**.  At 12:50 pm, CCTV coverage in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE.  MINNI exited the **SUBJECT VEHICLE** with a brown box and walked to the SUBJECT RESIDENCE. Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics from the Greece Station on the morning of July 20, 2021.  I further believe that MINNI had secured the white box from the floor and removed the narcotics from that box and re-packaged the narcotics into the brown box which was in his possession when he left the Greece Station.  MINNI then used the **SUBJECT VEHICLE** to transport the narcotics back to the SUBJECT RESIDENCE.

31.     On August 9, 2021, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE** at 10:07 am.  MINNI exited the **SUBJECT VEHICLE** and retrieved a white box from the rear compartment of the **SUBJECT VEHICLE** and carried it to the SUBJECT RESIDENCE.  At

16

4:53 pm, an unknown white male arrived in MINNI's driveway driving a black pick-up truck. The male walked to the SUBJECT RESIDENCE and returned only 3 minutes later carrying a white box which he placed into the driver compartment and departed.  Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics from the Greece Station on the morning of August 9, 2021.  I further believe that the unknown male who arrived later that day had come to the SUBJECT RESIDENCE to pick up a quantity of narcotics.

32.     On November 6, 2021, at 7:07 am, CCTV coverage in the Greece Station captured MINNI carrying a white priority mail box from the delivery floor into his office.  At 7:08 am, MINNI entered his office carrying this box.  At 7:10 am, MINNI exists his office carrying a white priority mailbox and at 7:11 am, appears to leave the box around the same mail bin that he previously took it from.  At 7:52am, MINNI enters his office carrying a brown box, top open and appearing to be empty, and then at 7:56 am, MINNI exists his office carrying a closed brown box.  MINNI then walks to the **SUBJECT VEHICLE** with the brown box, places the box inside the **SUBJECT VEHICLE**, and departs the Greece Station at 7:57am.  At 7:59 am, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI arriving at the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**.  MINNI exited the **SUBJECT VEHICLE** and removed a brown box from the rear compartment and took it to the SUBJECT RESIDENCE.  According to USPS records, MINNI did not have any parcels scheduled for delivery to the SUBJECT RESIDENCE on November 6, 2021.  Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics from the Greece Station on the morning of November 6, 2021. I further believe that MINNI had secured the white box from the floor and removed the

17

narcotics from that box and re-packaged the narcotics into the brown box which was in his possession when he left the Greece Station. MINNI then used the **SUBJECT VEHICLE** to transport the narcotics back to the SUBJECT RESIDENCE.

33.     On November 8, 2021, at 7:03 am, CCTV coverage in the Greece Station captured MINNI carrying a white box from the delivery floor into his office. At 7:06 am, MINNI exited his office carrying this box and at 7:06 am, threw a box into a USPS mail container. At 7:38 am, MINNI entered his office carrying white box that is open at the top and appears to be empty. MINNI entered and exited his office several times between 7:38am and 9:04 am, and at 9:05 am, MINNI departs his office carrying a white priority mail box. MINNI then walks to the **SUBJECT VEHICLE** with the box and places the box inside the **SUBJECT VEHICLE**. MINNI returned inside to the Greece Station. At 11:10 am, MINNI walked to the **SUBJECT VEHICLE** in the parking lot and appears to remove the front license plate from the **SUBJECT VEHICLE**. MINNI then gets into the **SUBJECT VEHICLE** and drives away at 11:11am. At 12:18 pm, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI arriving home in the **SUBJECT VEHICLE**. There was a landscape company taking care of MINNI's property at the time of his arrival. MINNI exited the **SUBJECT VEHICLE** and walked to the SUBJECT RESIDENCE, and at 12:20 pm, MINNI walked to his mailbox and then began spraying his walkway and driveway for bugs. At 12:35 pm, after interacting with members of the landscape service, MINNI went to the **SUBJECT VEHICLE** and removed a white box from the rear driver side compartment and took it to the SUBJECT RESIDENCE. According to USPS records, MINNI did not have any parcels scheduled for delivery to the SUBJECT RESIDENCE on November 8, 2021. Based upon

18

my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics from the Greece Station on the morning of November 8, 2021. MINNI then used the **SUBJECT VEHICLE** to transport the narcotics back to the SUBJECT RESIDENCE.

34.     On November 17, 2021, at 8:34 am, CCTV coverage in the Greece Station captured MINNI entering his office carrying a brown box. It is unknown where MINNI retrieved the box from as surveillance cameras do not capture the event.  At 8:50 am, MINNI departed his office carrying a brown box.  At 8:51 am, MINNI entered the parking lot carrying what appeared to be a brown box towards the **SUBJECT VEHICLE**.  MINNI opened the rear driver's side door of the **SUBJECT VEHICLE** but his actions were concealed by the open door.  At 8:51 am, MINNI reappeared in camera view without any box or object in his hands before walking back towards the GBPO facility and out of camera view. At 10:24 am, MINNI returned to the **SUBJECT VEHICLE** and departed.   At 10:28 am, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**.  He exited the **SUBJECT VEHICLE** and retrieved a brown box from the rear driver side compartment and entered walked to the SUBJECT RESIDENCE.  According to USPS records, MINNI did not have any parcels scheduled for delivery to the SUBJECT RESIDENCE on November 17, 2021.  Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics from the Greece Station on the morning of November 17, 2021. MINNI then used the **SUBJECT VEHICLE** to transport the narcotics back to the SUBJECT RESIDENCE.

35.     On December 17, 2021, at 8:58 am, CCTV coverage in the Greece Station captured MINNI handling a white box sitting on top of other parcels inside a mail container. MINNI steps away, walks back to the mail container, and pushes the container away from where it was resting.   MINNI then removes the package from the mail container and at 8:59am, carries a white box into his office.   Between 9:01 and 9:18am, MINNI exits and enters his office, and then at 9:18am, MINNI departs his office carrying a white box.   At 9:19am, MINNI enters the parking lot and walks to the **SUBJECT VEHICLE** with the box. MINNI places the box inside the rear driver side door of the **SUBJECT VEHICLE**.   MINNI then walked briefly in the parking lot, without a box, and briefly returned to the **SUBJECT VEHICLE**.   He then walks from the **SUBJECT VEHICLE** back to the Greece Station with a piece of paper in his hand and re-enters the Greece Station at 9:20am.   MINNI enters his office at 9:21 am and at 9:36am, a USPS employee entered MINNI's office carrying a small brown box.   Within about 5 seconds, the employee leaves MINNI's office without a box.   At 9:59 am, MINNI leaves his office, carrying a small brown box, and walks to the parking lot. At 10:01 am, MINNI enters the **SUBJECT VEHICLE** with the small brown box and drives away at 10:02am.   At 10:05 am, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**. MINNI retrieved at least one box from the rear driver side compartment and took it to the SUBJECT RESIDENCE.   Due to the quality of the video, it was difficult to get a description of the box or whether there was a second box on top as he carried it to the SUBJECT RESIDENCE.   According to USPS records, MINNI had a delivery scheduled to the SUBJECT RESIDENCE on December 17, 2021, and that parcel denotes a "delivered / left with individual" scan at 9:36 am on December 17, 2021.   That scan and the timing

20

corresponds to the less-than 5 second visit to MINNI's office by an employee who brought the small brown box to MINNI's office.  It does not explain the white box that MINNI took out to the **SUBJECT VEHICLE** earlier that morning.  Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package, namely the white box, containing narcotics from the Greece Station on the morning of December 17, 2021. MINNI then used the **SUBJECT VEHICLE** to transport the narcotics back to the SUBJECT RESIDENCE.

36.    On January 20, 2022, at 7:27 am, CCTV coverage in the Greece Station captured MINNI carrying a white box from the delivery floor into his office.  Over the next few hours, MINNI enters and exists his office, sometimes empty handed, and at least twice (at 9:19 am and 10:08 am) enters his office carrying what appears to be flattened cardboard.  At 10:30 am, MINNI exists his office carrying a white box.  MINNI then walks to the **SUBJECT VEHICLE** with the white box and at 10:31 am, places the box inside the **SUBJECT VEHICLE**.  MINNI then returned inside to the Greece Station at 10:32 am.  Later, at 1:33 pm, MINNI gets into the **SUBJECT VEHICLE** and drives away.  At 3:27 pm, CCTV in the vicinity of the SUBJECT RESIDENCE captured MINNI returning to the SUBJECT RESIDENCE.   MINNI retrieved a white box from the rear driver side compartment of the **SUBJECT VEHICLE** and walked to the SUBJECT RESIDENCE. According to USPS records, MINNI did not have any parcels scheduled for delivery to the SUBJECT RESIDENCE on January 20, 2022.  Based upon my training, experience, and knowledge of the investigation, I believe that MINNI secured a package containing narcotics

from the Greece Station on January 20, 2022.  MINNI then used the **SUBJECT VEHICLE**
to transport the narcotics back to the SUBJECT RESIDENCE.


37.     On March 7, 2022, at 6:54 a.m., CCTV coverage in the vicinity of the GPO
captured MINNI remove, and at 6:55 a.m. walk away with, a large brown box from a USPS
mail container on the workroom floor. CCTV coverage from inside MINNI's office showed
MINNI move a large box underneath his desk and out of camera view. After the office lights
were turned on, MINNI sat in a chair and put on work gloves. MINNI leaned and reached
under his desk, appearing to manipulate the box out of sight. MINNI eventually pulled the
box from under the desk and partially into camera view. MINNI opened the top of the box
and pulled out approximately seven separate bundles enclosed in black wrapping.  MINNI
placed each bundle into or around filing cabinets next to his desk, and soon after departed his
office.  He later returned to his office with two stacks of USPS Priority Mail cardboard
envelopes that appeared to be new and unused. MINNI placed a majority of the cardboard
envelopes into the brown box and secured the box with brown packaging tape. At 7:05 a.m.,
MINNI departed his office with the brown box. Between 7:10 a.m. and 7:13 a.m.,  MINNI
brought into his office two empty brown boxes. MINNI opened the filing cabinet drawers and
divided the previously mentioned black wrapped bundles into the two brown boxes. MINNI
sealed each box with tape and departed his office with both boxes. At 7:19 a.m., CCTV
coverage in the vicinity of the GPO captured MINNI place both boxes in the rear
compartment of the **SUBJECT VEHICLE**. Based upon my training and experience, and my
participation in and knowledge of the investigation, I believe MINNI was removing narcotics
inside his office from a box he had taken from the floor of the GPO. MINNI exercised caution

22

while opening the box by wearing gloves, opening the box on the floor behind his desk, and concealing the contents of the box inside and around filing cabinet drawers.

38.     Continuing on March 7, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of the SUBJECT RESIDENCE. At 10:50 a.m., MINNI returned to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**. MINNI removed two brown boxes from the rear driver's side compartment of the **SUBJECT VEHICLE** and took them to the SUBJECT RESIDENCE. At 4:32 p.m., a white Chrysler 200, identical to one driven by a suspected co-conspirator, arrived. The white male driver exited the vehicle and walked to the SUBJECT RESIDENCE. At 4:35 p.m., the driver returned to the vehicle and departed.

39.     On March 25, 2022, at 7:28 a.m., CCTV coverage in the vicinity of the GPO captured MINNI remove, and walk away with, a white box from a USPS mail container on the workroom floor. MINNI entered his office at the GPO with the box at 7:29 a.m. At 7:30 a.m., CCTV coverage from inside MINNI's office revealed MINNI wearing work gloves and appearing to manipulate an item underneath his desk and out of camera view. At 7:31 a.m., MINNI brought into camera view a plastic accordion style binder. MINNI untied a cord in front of the binder and pulled from the container what appeared to be white cardboard or paper wrapped in clear plastic and enclosing a pliable material. MINNI placed the object into the middle drawer of a filing cabinet next to his desk. At 7:33 a.m., MINNI, back at his desk, brought into camera view what appeared to be an empty USPS priority mail Tyvek envelope. MINNI then folded and again placed the envelope underneath his desk. Continuing at 7:33

23

a.m., MINNI retrieved a roll of clear tape from a previously opened desk drawer and continued to manipulate the unseen item underneath his desk. At 7:34 a.m., MINNI reached underneath his desk and brought into camera view a closed, white, USPS priority mailbox, which MINNI took and left his office. At 7:35 a.m., CCTV coverage in the vicinity of the GPO captured MINNI place the white box into or around the same USPS container on the workroom floor the mailing was earlier removed from.

40.     A short while later, at 9:13 a.m., CCTV footage from inside MINNI's office showed MINNI holding an empty black and white box. MINNI proceeded to open the middle drawer of the filing cabinet located next to his desk and reach inside. MINNI, while turned away from the CCTV camera, appeared to remove a white object from the middle drawer and place the item inside the black and white box resting at his feet. MINNI then turned in his chair and placed the now-closed black and white box onto his desk. MINNI retrieved a roll of clear tape from his desk drawer and sealed the top of the box with a strip of tape. At 9:14 a.m., MINNI departed his office carrying the box. At 9:15 a.m., CCTV footage in the vicinity of the GPO captured MINNI place the black and white box into the rear compartment of the **SUBJECT VEHICLE**.  Based upon my training and experience, and my participation in and knowledge of the investigation, I believe MINNI removed a box containing narcotics from the floor of the GPO and took it to his office to repackage, and eventually remove from, the GPO. MINNI again exercised caution when handling the box by wearing gloves, manipulating the box on the floor behind his desk, and initially concealing the contents of the box inside a filing cabinet drawer.

41.     Continuing on March 25, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of the SUBJECT RESIDENCE. At 12:06 p.m., a male co-conspirator arrived at the home in a gray Dodge Ram pick-up truck. At 12:08 p.m., MINNI arrived at the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**. MINNI exited the **SUBJECT VEHICLE** and removed a black and white box from the rear compartment. The aforementioned box appeared to the be the same box earlier observed in MINNI'S office. MINNI handed the box to the male subject while standing in the driveway of the SUBJECT RESIDENCE. The co-conspirator secured the box in the rear compartment of his vehicle before he and MINNI walked to the SUBJECT RESIDENCE. At 12:12 p.m., MINNI and the co-conspirator returned to their respective vehicles and departed.

42.     Continuing on March 26, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of the SUBJECT RESIDENCE. At 8:07 a.m., MINNI returned to the SUBJECT RESIDENCE in the **SUBJECT VEHICLE**. MINNI exited the **SUBJECT VEHICLE** with a brown box and took it to the SUBJECT RESIDENCE.

43.     Continuing on April 14, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of the SUBJECT RESIDENCE. At 1:47 p.m., MINNI returned to his house, the SUBJECT RESIDENCE, in the **SUBJECT VEHICLE**. MINNI exited the **SUBJECT VEHICLE**, opened the door of the rear driver's side compartment, pulled out what appeared to be a plastic container with a dark bottom, and carried the item towards his residence and outside of the field of view of the camera.   This container resembled the container described in paragraphs 89-90 above.   At 2:29 pm, a person known to the

investigative team arrived at the SUBJECT RESIDENCE in his vehicle and walked to the house.   At 2:30 pm, this individual entered his vehicle and departed the SUBJECT RESIDENCE.   At 4:51 pm, a Dodge Caravan resembling the one registered to another person known to the investigative team and suspected to be a co-conspirator arrived at the SUBJECT RESIDENCE.  A white male exited the Caravan and walked to the SUBJECT RESIDENCE.  At 4:55 pm, the driver returned to the Caravan and departed the SUBJECT RESIDENCE.  Based upon my training, experience, and my participation in and knowledge of this investigation, I believe MINNI removed narcotics inside his office at the GPO from a box he had taken from the floor of the GPO. MINNI exercised caution while opening the box by wearing gloves, placing the box on the floor behind his desk, opening the box from the bottom, and initially concealing the container removed from the box inside a filing cabinet drawer.  I further believe that MINNI carried this container to the **SUBJECT VEHICLE** and transported it to the SUBJECT RESIDENCE.  Finally, I believe that MINNI conducted narcotics transactions with the two individuals described earlier in this paragraph, not long after he had returned to the SUBJECT RESIDENCE.

## ARREST OF MINNI

44.   On May 2, 2022, CCTV footage from in the Greece Station showed MINNI leave his office with a brown cardboard box and place it in the SUBJECT VEHICLE.  MINNI drove to Wegmans located at Latta Road and Long Pond Road, in the town of Greece and parked the SUBJECT VEHICLE in the Wegmans parking lot.  MINNI went into Wegmans empty-handed and was arrested when he returned to the SUBJECT VEHICLE.  Law enforcement observed the brown cardboard box behind the driver seat in the SUBJECT

26

VEHICLE.  Law enforcement executed a search warrant on the SUBJECT VEHICLE and the cardboard box was removed.  Law enforcement found four individually-packaged quantities of marijuana that weighed approximately four pounds inside the cardboard box.

## APPLICABLE LAW

45.    The **SUBJECT VEHICLE** constitutes property used to facilitate violations of 21 U.S.C. §§ 841 and 846, and is thus subject to seizure and forfeiture to the United States pursuant to the following law:

**Title 21, United States Code, Section 853** provides in pertinent part:

(a)    Property subject to criminal forfeiture

Any person convicted of a violation of this subchapter or subchapter II of this  chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—

(2)    any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation;

(f)     The government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same  manner as provided under a search warrant.  If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) may be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

**Title 21, United States Code, Section 881** provides in pertinent part:

> (a)     The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> > (4)     All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances].

## CONCLUSION AND REQUEST FOR RELIEF

46.     Based on this investigation referenced above, your Affiant submits there is probable cause to believe that the **SUBJECT VEHICLE** was used and was intended to be used to transport and facilitate the transportation, sale, receipt, or possession of controlled substances in violation of Subchapter I of Chapter 13 of Title 21 of the United States Code, Section 801 et. seq. and is therefore subject to seizure and forfeiture to the United States pursuant to Title 21, United States Code, Sections 853(a)(2) and 881(a)(4).

47.     The Court has authority to issue criminal seizure warrants as well as civil seizure warrants under applicable federal law. A seizure warrant is necessary to insure that the vehicle is maintained and stored by the government as the best method to preserve their value in the event of forfeiture.

WHEREFORE, it is respectfully requested that the Court grant the Government's application for the Seizure Warrant as described herein.

STEPHEN J. CSAPO
Special Agent
Federal Bureau of Investigation

Affidavit submitted electronically by email in . pdf format. Oath administered, and contents and signature, attested to me telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May  9 , 2022.

HON. MARIAN W. PAYSON
United States Magistrate Judge

29

# EXHIBIT 1

A⬤ 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

Western District of New York

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 22-MJ-572 |
| RAPLH MINNI | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   on or about May 2018 to April 2022   in the county of _____ Monroe _____ in the

_____ Western _____ District of _____ New York _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), (b)(1)(C), and 846 | Possession with the intent to distribute, and to distributed marijuana, a Schedule I controlled substance, and conspiracy and attempting to possess with the intent to distribute, and to distribute, marijuana, a Schedule I controlled substance, and 500 grams or more of cocaine, a Schedule II controlled substance |

This criminal complaint is based on these facts:

See the attached affidavit of USPS-OIG Special Agent Brendan M. Boone.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Brendan M. Boone, Special Agent, USPS-OIG
*Printed name and title*

Sworn to telephonically by the affiant.

Date:   April 15, 2022

_____
*Judge's signature*

City and state:   Rochester, New York

Hon. Mark W. Pedersen, U.S.M.J.
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK    )
COUNTY OF MONROE    )    SS:
CITY OF ROCHESTER    )


I, Brendan M. Boone, being duly sworn, state as follows:

1.     I am a Special Agent with the United States Postal Service (USPS), Office of Inspector General (OIG), in Buffalo, New York, and have been so employed since April 2020. Before my hiring with the USPS OIG, I was employed as a Special Agent with the United States Secret Service assigned to the Washington, D.C. Field Office for over 3 years. My current duties include investigating allegations of fraud, waste, and abuse in matters involving the USPS. I am currently assigned to investigate allegations of mail theft committed by USPS employees or contractors. I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. I have also received additional training covering various topics, including interviewing, legal issues, search warrants, investigative techniques, and fraud investigations. I have received specialized training regarding internal mail theft, mail processing, and schemes and techniques employed by internal mail thieves. In the course of my law enforcement career, I have conducted or participated in numerous types of investigations, including counterfeit United States currency, financial crimes, embezzlement, identity theft, fraud, delay and destruction of mail, mail theft, and narcotics.


2.     This affidavit is made in support of a Criminal Complaint charging **RALPH MINNI (MINNI)** with possession with the intent to distribute, and to distribute marijuana, a

Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and conspiracy to possess and attempt to possess with the intent to distribute, and to distribute, marijuana, a Schedule I controlled substance, and 500 grams or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C), and 846.

3.      The facts set forth in this affidavit are based on my personal knowledge obtained through my participation in this investigation, my review of Federal Bureau of Investigation (FBI) affidavits submitted to this court, my review of reports and documents prepared by the USPS OIG and FBI, my review of lawfully installed closed circuit television (CCTV) cameras inside and around the Greece Branch Post Office (GPO), my review of lawfully installed CCTV cameras inside **MINNI'S** office at the GPO, information obtained from a global positioning system (GPS) device on **MINNI'S** vehicle, my review of information obtained from internal USPS databases available to USPS OIG Special Agents; my review of information from USPS OIG databases and reports, information obtained from USPS employees, and knowledge obtained from other law enforcement agents involved in this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, this affidavit does not set forth all of my knowledge regarding this matter. Rather, I have set forth only those facts I believe are necessary to establish probable cause to show **MINNI** violated 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 846.

## SOURCES OF INFORMATION

4.      The USPS OIG and the FBI Buffalo Division, Rochester Resident Agency have conducted an investigation into the drug trafficking activities of **MINNI** and others known to

this investigation. **MINNI** is the station manager of the GPO located at 3245 Latta Road, Rochester, NY 14612 and has been employed by the USPS since 1998. The investigation to date has revealed that **MINNI** is using his position and facilities for the purpose of obtaining quantities of narcotics, and is then distributing the narcotics to other co-conspirators. The investigation has also shown that **MINNI** has obtained narcotics directly through the USPS mail stream and distributed the narcotics with the assistance of USPS employees and other individuals. To this end, one of the USPS employees who has assisted **MINNI** is **GRACE LOPEZ (LOPEZ)**. Finally, the investigation has indicated that **MINNI** was supplied by an unknown source in California and that **MINNI** may be supplying other postal employees within the Western District of New York with narcotics.

## INFORMATION RECEIVED FROM SOURCES

### CONFIDENTIAL SOURCE ONE

5.      Confidential Source One (hereinafter, "CS-1") has provided information to law enforcement as an anonymous caller and concerned citizen. On February 24, 2018, the Monroe County Public Safety Department received an anonymous tip regarding **MINNI**. CS-1 advised **MINNI** resides at 12 Kimbrook Circle, Rochester, New York, and that he is employed as a USPS manager.  CS-1 also advised **MINNI** is Caucasian and that he owns a black Chrysler 300 and a white Ford F150 Roush. CS-1 stated **MINNI** sells cocaine and marijuana and that, specifically, he supplies it to an individual who in turn sells the narcotics. An FBI Special Agent contacted CS-1 via telephone on or about June 11, 2018, and CS-1 confirmed all of the details he/she had provided over the internet tip site.  Additionally, CS-

3

1 advised the people who are involved in **MINNI**'s narcotics business know him as "Joe" and not as Ralph.

      6.    The FBI established the credibility of CS-1 through law enforcement databases, surveillances, and other facts presented in this affidavit. My review of a USPS OIG database confirmed **MINNI** is the station manager of the GPO in Greece, New York; Rochester, New York Police Department reports obtained and reviewed by the FBI indicate **MINNI** has used the name "Joe" when patronizing prostitutes in order to maintain confidentiality with his family; at the time of CS-1's reporting, an FBI Special Agent queried the eJusticeNY Integrated Justice Portal and determined **MINNI** was the registered owner of a black Chrysler 300 and a white Ford F150 Roush. Law enforcement agents have observed both of these vehicles parked in the driveway overnight at 12 Kimbrook Circle on numerous occasions. Members of the investigative team began conducting physical surveillance in and around 12 Kimbrook Circle in May 2018 and have intermittently conducted physical surveillance in this area through the present date. In June 2018, FBI agents initiated CCTV coverage in the area of 12 Kimbrook Circle. This coverage has been viewed by the FBI on an almost daily basis and has continued through the present date. In addition, my review of CCTV footage in and around the GPO has confirmed **MINNI** utlizes a white Ford F150 Roush pick-up truck on a daily basis.

4

CONFIDENTIAL SOURCE THREE

7.       Confidential Source Three (hereinafter, "CS-3") has provided information to

the RPD and the ATF since May 29, 2018 and to the FBI since June 22, 2018. CS-3 continues

to cooperate with all three agencies.[1] The following is a summary of some of the information

provided by CS-3 to the investigative team regarding this investigation:

a.       On May 29, 2018, CS-3 advised a member of the investigative team that

**LOPEZ** is an employee of the Henrietta USPS station[2]. CS-3 also stated **LOPEZ** told CS-3

she **[LOPEZ]** can obtain ten pounds of marijuana through the mail every day.

b.       On August 9, 2018, CS-3 met with **LOPEZ** at **LOPEZ**'s residence, 365

Rosewood Terrace, Rochester, New York. While at her residence, **LOPEZ** took CS-3 to her

garage and showed him/her a bullet proof vest and some kind of protective helmet. **LOPEZ**

told CS-3 that her friend at the post office told her that he knows he is being watched and that

he had given her these items to get rid of. **LOPEZ** also advised that her friend at the post

office had all of his guns shipped to an ex-girlfriend or ex-wife in Texas because he fears that

he is being watched. Further, **LOPEZ** stated that this same friend had just gotten a $30,000.00

shipment of narcotics. Finally, **LOPEZ** showed CS-3 that she had two pounds of marijuana

that she is selling for $1,900.00 per pound.

---

[1] CS-3 has pleaded guilty to a federal narcotics distribution charge and related federal firearms
charge, and has provided information to the RPD, the ATF, and the FBI in return for
consideration at sentencing. CS-3 also has a prior misdemeanor conviction for unauthorized
use of a motor vehicle. CS-3 has known **LOPEZ** for several years and has provided
information about her that has been corroborated by multiple sources and techniques. Since
the start of this investigation, CS-3 has also conducted 8 (eight) controlled purchases of
marijuana from **LOPEZ** and recorded the conversations with **LOPEZ** during and leading up
to these transactions. CS-3 has also conducted two (2) controlled purchases of firearms from
**LOPEZ** as well. For these reasons, your affiant believes CS-3 to be credible.
[2]       My review of a USPS OIG database confirms **LOPEZ** is a USPS employee, assigned
to the Rochester Processing and Distribution Center, 1335 Jefferson Road, Rochester, NY
since 2016.

c.     On August 24, 2018, CS-3 advised the FBI that "Ralph" is **LOPEZ'S** boyfriend who works at the United States Post Office and provides her with quantities of marijuana to sell. CS-3 advised "Ralph" is 48 years old and drives a pick-up truck.

d.     On August 31. 2018, CS-3 recorded a conversation with **LOPEZ** in which **LOPEZ** discussed the fact that **MINNI** is scared and has temporarily stopped distributing narcotics. **LOPEZ** stated, "In December nothing happens to him I think he'll probably start trying to like, he says a year, but I think the money pressure will get to him eventually where he'll come back out." She then stated, "You got all that work and you can't move it. He's stuck right now cause he's afraid." In the same conversation the following exchange occurred between **LOPEZ** and CS-3:

CS-3:        He's movin' it through the mail, huh?

**LOPEZ**:     Thirty pounds or more at once. It wasn't under his name or anything. He says they don't have anything. He donated – I went with him to the gun club – mad bullets. At least $10,000.00 worth. It's all tactical, not deer hunting. Protecting himself.

e.     On November 27, 2018, CS-3 met with **LOPEZ** and recorded the meeting. During this meeting, **LOPEZ** and CS-3 discussed, among other things, the logistics of receiving packages of narcotics. CS-3 asked **LOPEZ** how "Ralph" did it and she stated that she never asked him how he did it. She stated further that if he got indicted, it wouldn't affect her or her job. Later in the conversation, **LOPEZ** told CS-3 that he (meaning **MINNI**) doesn't have friends in the "feds" but that **MINNI** was alerted casually. She explained that a friend of **MINNI'S** was talking to some individuals who revealed that there was an investigation on someone in the Greece Post Office. This friend in turn told **MINNI** and **MINNI** said, "oh shit everything's cut the fuck off."

6

f.       On January 12, 2019, CS-3 contacted a member of the investigative team and advised CS-3 spoke with **LOPEZ,** who told CS-3 **MINNI** had started selling narcotics again. **LOPEZ** further told CS-3 that **MINNI** is trying to impress a new girl at the post office and needs to get his money flowing again.

g.      On January 28, 2019, CS-3 contacted a member of the investigative team and advised **LOPEZ** had just used Face Time to show CS-3 a quantity of marijuana that she had available to sell. The quantity was approximately one pound. She also advised that the pound of marijuana was from **MINNI**.

h.      On March 13, 2019, CS-3 contacted a member of the investigative team and advised CS-3 had just spoken to **LOPEZ** and that **LOPEZ** told CS-3 that **MINNI** is getting marijuana from California for $1,000.00 a pound.

ı.      On March 25, 2019, CS-3 met with **LOPEZ** and recorded the meeting. During the meeting, CS-3 asked **LOPEZ** whether **MINNI** would meet directly with CS-3 for the purpose of engaging in narcotics transactions. Among other things, **LOPEZ** stated, "He only fuckin with the people he knows for sure wouldn't be out there, and that is after months and months of not selling anything. He did almost ten months without selling anything." She further indicated that **MINNI** would not be likely to introduce anyone "new to the circle."

j.      On June 11, 2019, CS-3 contacted a member of the investigative team and advised **LOPEZ** indicated to CS-3 that **MINNI** had just received a quantity of marijuana through the mail and that they were ready to sell CS-3 pound quantities of marijuana.

k.      On July 15, 2019, CS-3 contacted a member of the investigative team and advised **LOPEZ** had just told CS-3 that **MINNI** had just received a fresh shipment of marijuana and that **MINNI** is expecting CS-3 to make a purchase.

7

1.     On January 17, 2020, CS-3 contacted a member of the investigative team and advised he/she had just communicated with **LOPEZ**. **LOPEZ** advised CS-3 that she and **MINNI** want to buy a kilogram of cocaine from CS-3 and that they are considering giving CS-3 an address to which CS-3 can have his/her suppliers ship the cocaine directly. **LOPEZ** also advised that **MINNI** had just received four pounds of marijuana.

## CONTROLLED PURCHASES

8.     The controlled purchases that follow as described occurred between CS-3 and **LOPEZ**. This investigation and the facts communicated in this affidavit have established that although the purchases were made directly from **LOPEZ**, her source of supply for the marijuana was **MINNI**.

## August 15, 2018

9.     Paragraph 7(b) above describes a meeting between CS-3 and **LOPEZ** at **LOPEZ**'s residence, 365 Rosewood Terrace. During this meeting on August 9, 2018, **LOPEZ** showed CS-3 two pounds of marijuana and told CS-3 that she is charging $1,900.00 per pound.

10.    On Wednesday, August 15, 2018, at the direction of the investigating team, CS-3 contacted **LOPEZ** via telephone and arranged to meet her at her residence to purchase a pound of marijuana. The investigative team conducted a surveillance and observed CS-3 arriving at 365 Rosewood Terrace. In and around the same time that CS-3 arrived at **LOPEZ**'s residence, a consensually monitored video device captured **LOPEZ** standing on the porch of 365 Rosewood Terrace. While at **LOPEZ**'s residence, CS-3 purchased a pound of marijuana from **LOPEZ** for $1,900.00. During this transaction, **LOPEZ** made the following statement, "Let me connect with this dude today and give him the money and see what he says". After

8

the transaction was complete, CS-3 departed the residence. Surveilling agents then observed **LOPEZ** leaving her residence five minutes after the departure of CS-3. Pen register coverage reviewed by the FBI of 585-831-2185, a phone number used by **MINNI** at the time of the controlled purchase, indicated a series of three text messages between **MINNI** and 585-397-2914 which were initiated within 20 minutes of **LOPEZ**'s departure from her residence. The investigation had determined 585-397-2914 was a telephone number used by **LOPEZ**, as it is the same number that CS-3 used to coordinate the purchase from **LOPEZ**. Following two brief stops along the way, **LOPEZ** arrived at 12 Kimbrook Circle, exited her black Honda and walked to the house. Approximately two hours later, CCTV coverage in the area of **MINNI'S** residence captured **MINNI** and **LOPEZ** exiting 12 Kimbrook Circle, entering **MINNI'S** Chrysler 300, and departing the area.

11.     On this same date, agents took custody of the marijuana from CS-3. It had a total package weight of 1.65 pounds to include all packaging. It was leafy green in appearance and smelled like marijuana.

## May 11, 2019

12.     On May 11, 2019, CS-3 contacted a member of the investigative team and advised that he/she had just received a call from **LOPEZ**. **LOPEZ** told CS-3 that **MINNI** has four pounds of marijuana ready for CS-3 to purchase once she gets out of work. **LOPEZ** contacted CS-3 again and advised him/her that she wanted CS-3 to go to her house to make the purchase because she already had the marijuana there. Agents met with CS-3 at approximately 3:00 PM. on this date and directed him/her with detailed instructions how to complete the controlled purchase with **LOPEZ**. Agents also put a recording device on CS-3 and provided him/her with $8,600.00 for the purchase. Each pound of marijuana was

9

$1,900.00 and **LOPEZ** wanted an additional $1,000.00 for her role in securing **MINNI** as a source of supply for the marijuana.

13.     On May 11, 2019, at 3:10 p.m., agents initiated surveillance in the vicinity of **LOPEZ**'s residence, 365 Rosewood Terrace, Rochester, NY.   At 3:24 p.m., agents observed CS-3's vehicle turn into the driveway of 365 Rosewood Terrace.   At 3:36 p.m., agents observed CS-3's vehicle departing from 365 Rosewood Terrace.   At 3:53 p.m., agents observed **LOPEZ** departing the area in a black Chrysler 300 bearing New York plates FSX 2610[3].   At 4:22 p.m., agents observed this vehicle pulling into the driveway of 12 Kimbrook Circle.

14.     Continuing on May 11, 2019, members of the investigative team met with CS-3 and took custody of the marijuana from CS-3.   The marijuana was packaged in four individually wrapped quantities and appeared to be a green and leafy substance with a strong marijuana odor. The marijuana was packaged in Food Saver clear bags and had a total package weight of 2.38 kilograms, which is approximately 5.23 pounds.

### June 13, 2019

15.     On June 11, 2019, CS-3 advised a member of the investigative team that he/she had just spoken to **LOPEZ** and that **LOPEZ** and **MINNI** were ready to sell pounds of marijuana to CS-3.   CS-3 thought **LOPEZ** indicated that **MINNI** had just received six (6) pounds in the mail.

16.     On June 13, 2019, agents met with CS-3 and provided him/her with detailed instructions on how to conduct the controlled purchase of four pounds of marijuana from **LOPEZ**.   Agents provided CS-3 with a body recorder and $8,600.00 for the purchase.

---

[3]      On this date, this vehicle was registered to **MINNI**, 12 Kimbrook Circle.

10

17.     On June 13, 2019, at 3:45 p.m., surveillance was initiated in the vicinity of 365 Rosewood Terrace. At 4:23 p.m., agents observed CS-3's vehicle turning onto Rosewood Terrace. At 4:46 p.m., agents observed CS-3's vehicle departing the vicinity of 365 Rosewood Terrace. At 5:10 p.m., **LOPEZ** was observed in her black Honda Accord leaving the vicinity of 365 Rosewood Terrace. At 5:38 p.m., agents observed **LOPEZ**'s vehicle parked in the driveway of 12 Kimbrook Circle.

18.     On June 13, 2019, agents met with and took custody of the marijuana from CS-3. The marijuana was packed in four individual vacuum sealed Food Saver bags and enclosed in a cardboard box. The picture and detailing of the cardboard box indicated that it had originally contained an "Ion Sport" portable speaker.     The marijuana appeared green and leafy.

19.     After a member of the investigative team reviewed CCTV footage from the vicinity of 12 Kimbrook Circle, the following observations were made:

| DATE | TIME | OBSERVATIONS |
|------|------|-------------|
| 06/10/19 | 7:11 PM | **MINNI** and **LOPEZ** arrived at 12 Kimbrook Circle in the black Chrysler 300. **MINNI** retrieved a box from the trunk and they both walked to the front of the house. The box was identical to the Ion Sport portable speaker box that the marijuana was contained in. |
| 06/11/19 | 10:47 **AM** | **LOPEZ** pulled into **MINNI**'s driveway. **MINNI** exited his residence, walked to his white F150 and gets a large brown box out of the back driver's seat. He then returned to his residence through the side garage door. |

11

| | | |
|---|---|---|
| 06/12/19 | 6:31 AM | **LOPEZ** exited 12 Kimbrook Circle with a box that she placed in the trunk of her vehicle. She entered her vehicle and departed. The box was identical to the Ion Sport portable speaker box. |

19. An FBI Special Agent reviewed the recording made by CS-3 during the June 13, 2019, transaction. During the meeting, **LOPEZ** advised **MINNI**'s connection in California told **MINNI** they are cracking down on the people in California and that he wouldn't be able to send the marijuana as often. **MINNI**'s connection told **MINNI** to bring a U-Haul to California to pick up a large quantity. **MINNI** and **LOPEZ** had started making plans to do so. **LOPEZ** stated that they have been coming up with a story to use if they get stopped by the cops. She **[LOPEZ]** advised nobody knows how **MINNI** makes money and that they think he bullies people into paying debts. She said, "He comes to work with a suit and tie on, that smile on his face, he waiting for that package." She also said, "That's how I want to do it because I'm gonna be a big ass boss at the post office and it's gonna be even crazier."

### March 13, 2020

20. On March 10, 2020, at approximately 11:02 a.m., **LOPEZ** called CS-3 and advised him/her that **MINNI** has two pounds of marijuana ready for CS-3 to purchase. A member of the investigative team's review of records from AT&T confirm that a voice call between CS-3's phone number and the **LOPEZ** PHONE occurred at this time. This call was not recorded, and on March 11, 2020, the day after **LOPEZ** called CS-3, CS-3 contacted a member of the investigative team. At the direction of an FBI Special Agent, CS-3 advised **LOPEZ** that he/she could make the purchase on March 13, 2020, and both CS-3 and **LOPEZ** agreed to conduct the transaction in the vicinity of the Seneca Park Zoo.

12

21.     On March 13, 2020, agents met with CS-3 and provided him/her with detailed instructions regarding the controlled purchase of two pounds of marijuana from **LOPEZ**. Agents placed a recording device on CS-3 and provided CS-3 with $4,600.00 for the purchase.

22.     On March 13, 2020, surveillance was initiated in the vicinity of the Seneca Park Zoo. Additionally, members of the investigative team were watching CCTV coverage of 12 Kimbrook Circle. At 4:53 p.m., **LOPEZ** exited **MINNI**'s residence, 12 Kimbrook Circle, carrying a brown box and entered her Honda Accord and departed from the residence. At 5:09 p.m., agents observed **LOPEZ** park her vehicle alongside CS-3's vehicle and enter the vehicle. At 5:37 p.m., agents observed **LOPEZ** exit CS-3's vehicle and enter her Honda Accord. At 5:45 p.m., agents observed **LOPEZ** departing the Seneca Park Zoo area. Upon reviewing CCTV coverage after the surveillance was terminated, agents observed **LOPEZ** arriving back at 12 Kimbrook Circle at 6:12 p.m. **LOPEZ** exited her vehicle and walked to the residence with a dark bag.

23.     On March 13, 2020, agents took custody of the marijuana from CS-3. The marijuana was packaged in two clear Ziploc baggies inside of a brown cardboard USPS box. The total package weight was 2.3 kilograms and the marijuana was green and leafy and had a strong marijuana odor.

24.     Members of the investigative team reviewed CCTV coverage in and around the GPO from March 11, 2020, and observed the following:

9:08 a.m.      **MINNI** carries what appears to be a white priority box into his office and within a minute exits his office without the box.

9:09 a.m.      **MINNI** returns to his office.

9:10 a.m.      **MINNI** leaves his office with the white priority box.

9:13 a.m.      **MINNI** returns to his office with an empty tan/brown box.

13

9:14 a.m.    **MINNI** leaves his office with a sealed tan/brown box. The box appears to be identical to the one he had brought into his office that was empty.

9:14:51 a.m.  **MINNI** carries the tan/brown box to his vehicle and places it in his truck.

11:00 a.m.   **MINNI** departs the GPO in his truck.

25.    An FBI Special Agent reviewed CCTV coverage from March 11, 2020, that was recorded in the vicinity of 12 Kimbrook Circle, which showed **MINNI** arriving home at 11:04 a.m. and carrying a box to his residence. An FBI Special Agent also reviewed a pen register on **MINNI'S** phone, 585-794-1681, from that same day and determined there were six contacts, all of which were voice calls, between 585-794-1681 and **LOPEZ's** phone (585-397-2914), from 7:06 am to 4:34 pm.

## EVIDENCE OBTAINED FROM TRASH SEIZURES

26.    On August 2, 2018, members of the investigative team seized trash placed at the curb for collection from MINNI's residence, 12 Kimbrook Circle, Rochester, New York. Among the items seized were the following: one "Shield N Seal" storage package with small amounts of a green leafy substance which field tested positive for the presence of marijuana; one empty "Shield N Seal" storage package that smelled like marijuana; one handwritten ledger containing nine names and various numbers adjacent to each name.

27.    On October 31, 2019, members of the investigative team seized trash placed at the curb for collection at 12 Kimbrook Circle, Rochester, New York. Among the items seized by agents were the following: one USPS Parcel Select Box; one USPS Priority Mail Envelope; one UPS Express Pad Pak; one USPS Medium Box; one thin rectangular brown box; four

14

FoodSaver clear rectangular storage bags that had been cut open; two Ziploc Vacuum Sealed System clear bags that has been cut open; three smaller FoodSaver clear storage bags that had been cut open. Based upon my training and experience and my knowledge of and participation in this investigation, and the evidence collected above, I believe **MINNI** was discarding marijuana packaging from marijuana shipments that **MINNI** received from his supplier in the U.S. Mail stream. CCTV footage from the GPO as well as at **MINNI'S** residence has often captured **MINNI** departing the post office with cardboard boxes and arriving at his residence with boxes only minutes later.

28.     On May 21, 2020, members of the investigative team seized the trash from 12 Kimbrook Circle, Rochester, New York. Among the items seized by the team were the following: one cardboard shipping box; two FoodSaver clear freezer bags both of which had a marijuana odor. Based upon my training and experience and my knowledge of and participation in this investigation, and the evidence collected above, I believe **MINNI** was discarding marijuana packaging from marijuana shipments that **MINNI** received from his supplier.

## MINNI DIVERTING A NARCOTICS PACKAGE AT THE GPO

29.     On January 22, 2021, CS-3 conducted a controlled purchase of approximately two (2) pounds of marijuana from **LOPEZ**. The meeting between **LOPEZ** and CS-3 was consensually recorded. During the meeting, **LOPEZ** advised that she and Ralph [**MINNI**] were traveling to California in June to meet with his supplier. **LOPEZ** stated Ralph is going to grab "mad shit" during this trip. Furthermore, during this meeting, CS-3 told **LOPEZ** that he/she needed a way to move cocaine up to Rochester without losing it. In response, **LOPEZ**

15

told the CHS that he/she could send the box to her house and that Ralph **[MINNI]** would tell her if they are watching her.

30.     On January 23, 2021, CS-3 contacted an FBI Special Agent via telephone and advised that he/she had spoken to **LOPEZ** again about the shipment of cocaine through the GPO. **LOPEZ** told CS-3 that Ralph **[MINNI]** is willing to have it shipped through his branch station (the GPO) to provide a degree of protection once it arrives in Rochester. **LOPEZ** and CS-3 agreed that **LOPEZ** and Ralph **[MINNI]** would get $5,000.00 for each shipment that came through the GPO. **LOPEZ** further advised that she would be seeing Ralph **[MINNI]** later in the day and would firm things up with him.

31.     On January 25, 2021, CS-3 met with **LOPEZ** at her residence, 130 Afton Street, Rochester, New York 14612, and recorded the meeting, reviewed by a member of the investigative team. **LOPEZ** discussed how drug packages come through **MINNI'S** office, the Greece Station, and how he grabs the packages from the station. She made it clear **MINNI** does not have control over the drug package until it reaches his station but that once it reaches his station there is no risk of it being seized or of him getting caught in a sting by the inspectors. She stated "Ralph's **[MINNI'S]** packages have gotten seized before. So, it doesn't have to do with Ralph being able to have a set up where his packages don't specifically get seized. At the end of the day, he has no control over any of this shit until the package gets to his station." **LOPEZ** directed CS-3 to tell his/her suppliers to send the shipment of cocaine to her address and mail destined for her residence goes through the GPO. She also told CS-3 to use either "Richard Hampton" or '-----' Hampton as the addressee (Your affiant has purposely omitted the second name **LOPEZ** provided because it is the name of her minor son). **LOPEZ** went on to explain "Richard Hampton" is the name of the father of her child, and if anyone caught

16

Ralph removing the package from the station, he [MINNI] could just say that he knew it was going to **LOPEZ** (his girlfriend at the time) and that he was going to drop it off to her. **LOPEZ** also made the following statement: "We were talking about whether there were other addresses we could send it to because I was definitely not comfortable with mine but he [MINNI] tried to make me feel safe about it, so. We were gonna say that if they seize the package with my shit on it, I was gonna be like 'My baby's dad must uh, you know, doing some crazy ass shit cause I don't know why he would put my son's, you know what I mean, like some story we was gonna come up with." Finally, **LOPEZ** made the following two statements: "My address goes to his station. The carrier we have on there, she's, she'd be like 'hey, here ya go'.", and "He's gonna grab it and bring it to me. Ralph is grabbing it from the station."

32.     On February 23, 2021, CS-3 and **LOPEZ** exchanged text messages in which **LOPEZ** advised she was back in town, and CS-3 replying "Good, they dropping it in the mail tonight." **LOPEZ** replied, "Perfect." That same day, at the direction of an FBI Special Agent, an undercover employee mailed a box with an approximate total weight of 2 lbs 12 oz to '----' Hampton, 130 Afton Street, Rochester, New York 14612. The package was described as a cardboard box containing fake narcotics, specifically fake cocaine. These exchanges were relative to the plan discussed in paragraphs 29 through 31 for shipping a package of cocaine through the GPO to **LOPEZ'S** residence.

33.     On February 25, 2021, the package of fake cocaine was delivered to the main processing center in Rochester, New York and was then transported to the GPO. At 9:39 a.m., CCTV camera footage in and around the GPO captured **MINNI** take a box into his office. At 9:48 a.m., **LOPEZ** entered **MINNI'S** office. At 9:49 a.m., **MINNI** and **LOPEZ**

17

exited **MINNI**'s office, with **LOPEZ** now carrying the box. At 11:14 a.m., **LOPEZ** pulled her vehicle alongside CS-3's vehicle at the Fastrac, 375 West Ridge Road, Rochester, New York 14615. **LOPEZ** then entered CS-3's vehicle. At 11:18 AM, **LOPEZ** exited CS-3's vehicle and departed. At 11:24 AM, a member of the investigative team took possession of the box from CS-3. This box was the identical box shipped by the undercover employee from Los Angeles on Febuary 23, 2021. The meeting between CS-3 and **LOPEZ** was recorded and reviewed by a member of the investigative team. During the meeting, CS-3 paid **LOPEZ** $5,000.00 and **LOPEZ** provided the box to CS-3. As soon as she [**LOPEZ**] entered CS-3's vehicle she stated the following, "I am fucking pissed not only that but there is two (2) in there and not one (1) and he knows that shit. Don't do that, I'm dead ass fucking serious. You told me one (1), that's what I told him. That's the risk he was willing to take. He was like, 'this is not one, Grace.' He wants me and him to get paid $5,000.00. And he don't like the way you packaged it." Based on my training and experience, and my knowledge of and participation in this investigation, I believe that LOPEZ's statements about how there were "two in there and not one", and that LOPEZ and MINNI were expecting "one," "one and "two" refer to one and two kilograms of cocaine.

## MINNI'S CONTINUED USE OF THE GPO TO FURTHER NARCOTICS ACTIVITIES

34.     As described above, **MINNI** has been observed on numerous occasions throughout this investigation at the GPO via CCTV footage removing packages from the post office floor and taking them into his assigned office. Later, he emerges with a package – sometimes one that appears to have been repackaged– and takes the item to his personal

18

vehicle in the GPO parking lot before departing the GPO in his vehicle immediately or shortly thereafter. There is no apparent legitimate business reason for these actions, and postal records show that on days referenced below when **MINNI** engaged in this conduct, no parcels were being delivered to **MINNI'S** residence. **MINNI'S** residence falls within the delivery responsibilities covered by the GPO.

35.    On May 15, 2021, CCTV in the vicinity of the Greece Station captured **MINNI** taking a priority box into and out of his office. Further, it appeared that the box was wrapped in a white plastic bag. The FBI's review of the GPS tracker on **MINNI**'s vehicle indicated **MINNI** arrived at the GPO at 6:24 AM and returned to 12 Kimbrook Circle directly from the GPO at 9:54 AM. Later that morning, CCTV in the vicinity of 12 Kimbrook Circle and captured **MINNI** returning to his residence at 9:54 AM. **MINNI** retrieved a package from the rear compartment of his vehicle an took it to his residence. The package consisted of a white plastic bag with a solid object inside which appeared to be a rectangular box. On May 16, 2021, at 3:21 PM, a black Chevy Avalanche identical to one driven by a known co-conspirator arrived at 12 Kimbrook Circle. The white male driver, believed to be the known co-conspirator, walked to the house. At 3:38 p.m., **MINNI** and the co-conspirator, carrying a white bag, walked to the driveway where upon the white bag was put into the driver's compartment of the Avalanche prior to departing.   Based upon my participation and knowledge of the investigation, I believe **MINNI** secured a package containing narcotics from the GPO on May 15, 2021. **MINNI** then transported the package to his residence and on May 16, 2021, **MINNI** conducted a narcotics transaction with a co-conspirator at his residence.

36.    On January 20, 2022, at 7:27 a.m., CCTV coverage in the GPO captured **MINNI** carrying a white box from the delivery floor into his office. Over the next few hours,

MINNI enters and exits his office, sometimes empty handed, and at least twice (at 9:19 a.m. and 10:08 a.m.) entered his office carrying what appeared to be flattened cardboard. At 10:30 a.m., MINNI exited his office carrying a white box. MINNI walked to his vehicle with the white box and at 10:31 a.m., placed the box inside his vehicle. MINNI then returned inside to the GPO at 10:32 a.m. Later, at 1:33 p.m., MINNI entered his vehicle and subsequently drove away. A member of the investigative team reviewed CCTV coverage in the vicinity of 12 Kimbrook Circle and observed MINNI returning to his residence at 3:27 p.m. MINNI retrieved a white box from the rear driver's side compartment of his vehicle and walked to the house. Based upon my participation and knowledge of the investigation, I believe MINNI secured a package containing narcotics from the Greece Station on January 20, 2022. MINNI then used his vehicle to transport the narcotics back to his residence.

37.     On February 16, 2022, at 6:47 a.m., CCTV coverage in the vicinity of the GPO captured MINNI carrying a white box from the workroom floor into his office. At 6:53 a.m., MINNI exited his office with a white box and at 6:55 a.m., MINNI returned to his office without the white box. At 10:38 a.m., MINNI entered his office with what appeared to be a flattened white box. At 11:53 a.m., MINNI exited his office with a closed white box. At 11:54 a.m., CCTV coverage captured MINNI carrying a white box next to his vehicle in the GPO parking lot. At 11:55 a.m., the MINNI'S vehicle departed the GPO. At 12:45 p.m., CCTV coverage in the vicinity of 12 Kimbrook Circle captured MINNI returning home in his Ford F150 Roush. MINNI exited his vehicle and opened the rear driver side compartment door and retrieved a white box and brought it to his residence. Based upon my participation and knowledge of the investigation, I believe MINNI secured a package containing narcotics from

20

the GPO on February 16, 2022, and used his vehicle to transport the narcotics back to his residence.

## OBSERVATIONS WITHIN MINNI'S OFFICE INSIDE THE GPO

38.     On February 28, 2022, and pursuant to court order, a CCTV camera was lawfully installed by members of the investigative team inside **MINNI'S** assigned office at the GPO. On March 31, 2022, the court order was reissued and a second CCTV camera was lawfully installed inside the **MINNI'S** office. CCTV footage obtained from the camera system revealed numerous instances of **MINNI** opening boxes obtained from the USPS mail stream and, at times, removing suspected narcotics from the package(s). CCTV camera footage also captured **MINNI** supplying USPS employees with user quantity amounts of suspected narcotics.

39.     On March 1, 2022, at 7:32 a.m., CCTV coverage captured **MINNI** and a male USPS employee ("Employee 1") inside **MINNI'S** office. **MINNI**, holding a clear plastic bag, removed a small, white, rock-like object from the bag and placed the item onto his desk. Employee 1, using a credit card or similar object, divided the white rock into three sections and slid two pieces to **MINNI**. **MINNI** put the pieces into a small, folded sheet of paper and placed the paper containing the substance in front of Employee 1. **MINNI** proceeded to tie the clear plastic bag and, after doing so, appeared to place the bag into the right breast pocket of his sports coat. Employee 1 crushed the remaining white substance into a powder and formed the powder into a line. Employee 1 leaned over the line and appeared to ingest the white powdery substance through his nasal cavity. Employee 1 took possession of the aforementioned piece of paper and **MINNI** brushed off the remaining white powder from his

21

desk using his hand. Based upon my participation and knowledge of the investigation, I believe **MINNI** possesed on his person a quantity of narcotics, some of which he provided to Employee 1. Furthermore, the white substance was prepared and used by Employee 1 in a manner consistant with the use of powder cocaine.

40.    On March 7, 2022, at 6:54 a.m., CCTV coverage in the vicinity of the GPO captured **MINNI** remove, and at 6:55 a.m. walk away with, a large brown box from a USPS mail container on the workroom floor. CCTV coverage from inside **MINNI'S** office showed **MINNI** move a large box underneath his desk and out of camera view. After the office lights were turned on, **MINNI** sat in a chair and put on work gloves. **MINNI** leaned and reached under his desk, appearing to manipulate the box out of sight. **MINNI** eventually pulled the box from under the desk and partially into camera view. **MINNI** opened the top of the box and pulled out approximately seven separate bundles enclosed in black wrapping. **MINNI** placed each bundle into or around filing cabinets next to his desk, and soon after departed his office and returned with two stacks of USPS Priority Mail cardboard envelopes that appeared to be new and unused. **MINNI** placed a majority of the cardboard envelopes into the rifled brown box, and secured the box with brown packaging tape. At 7:05 a.m., **MINNI** departed his office with the brown box. Between 7:10 a.m. and 7:13 a.m., **MINNI** brought into his office two empty brown boxes. **MINNI** opened the filing cabinet drawers and divided the previously mentioned black wrapped bundles into the two brown boxes. **MINNI** sealed each box with tape and departed his office with both boxes. At 7:19 a.m., CCTV coverage in the vicinity of the GPO captured **MINNI** place both boxes in the rear compartment of his vehicle. Based upon my participation and knowledge of this investigation, I believe **MINNI** was removing narcotics from a box he had taken from the floor of the GPO. **MINNI** exercised

22

caution while opening the box by wearing gloves, opening the box on the floor behind his desk, and concealing the contents of the box inside and around filing cabinet drawers.

41.    Continuing on March 7, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of **MINNI'S** residence. At 10:50 a.m., **MINNI** returned to the home in his vehicle. **MINNI** removed two brown boxes from the rear driver's side compartment and took them to his house. At 4:32 a.m., a white Chrysler 200, identical to one driven by a suspected co-conspirator, arrived. The white male driver exited the vehicle and walked to the house. At 4:35 p.m., the driver returned to the vehicle and departed. As described in paragraphs 26 through 28, multiple trash seizures from **MINNI'S** residence throughout the course of the investigation yielded discarded storage and vacuum sealed bags indicative of packaging used to ship and transport quantities of marijuana. Controlled purchases made from **LOPEZ,** who in turn was supplied by **MINNI,** has returned quantities of marijuana packaged in similar storage bags. A trash seizure on October 31, 2019, also yielded numerous boxes, to include USPS and UPS containers, a USPS priority mail envelope, and storage bags which appeared to be cut open. CCTV footage from the GPO as well as at **MINNI's** residence has captured **MINNI** departing his office and the GPO with cardboard boxes and subsequently arriving to his residence with boxes. I believe on March 7, 2022, based upon my experience and knowledge and my knowledge of and participation in this investigation, **MINNI** removed a box containing narcotics, likely marijuana, from the GPO work room floor and brought it to his office. Furthermore, I believe **MINNI** removed the narcotics from the box and repackaged the narcotics into two separate boxes before removing the packages from the GPO and transporting them to his residence for eventual dispersal.

42.     On March 12, 2022, at 8:02 a.m., CCTV coverage captured **MINNI** and a male USPS employee[4] (Employee 2) inside the Target Location. **MINNI** reached into a desk drawer and pulled out a small piece of paper. Employee 2 removed from his wallet what appeared to be a green plastic card and later one currency note. **MINNI** untied a small clear plastic bag containing a white substance, reached inside, and placed an unseen object into the small piece of paper before Employee 2 took possession of the torn paper. **MINNI** again reached into the clear plastic bag and removed a small white rock substance, placing it in front of Employee 2 on the desk. **MINNI** retied the clear plastic bag which still appeared to contain a white substance, and placed the bag into his right front pants pocket. Employee 2 folded the piece of paper and placed it into his wallet. Using the currency note, Employee 2 covered the white rock substance and with the plastic card appeared to crush the item. Once the note was removed, Employee 2 formed the now white powdery substance into a line with the plastic card. Employee 2 rolled the currency note, leaned over the white powder line, and appeared to ingest the substance through his nasal cavity on two occasions seconds apart. Based upon my participation and knowledge of the investigation, I believe **MINNI** possessed on his person a quantity of narcotics, some of which he provided to Employee 2. Furthermore, the white substance was prepared and used by Employee 2 in a manner consistent with the use of powder cocaine.

43.     On March 25, 2022, at 7:28 a.m., CCTV coverage in the vicinity of the GPO captured **MINNI** remove, and walk away with, a white box from a USPS mail container on the workroom floor. **MINNI** entered his office with the box at 7:29 a.m.. At 7:30 a.m., CCTV coverage from inside **MINNI'S** office showed **MINNI** wearing work gloves and appearing to

---

[4] The male subjects denoted as "Employee 1" and "Employee 2" are separate employees.

manipulate an item underneath his desk and out of camera view. At 7:31 a.m., **MINNI** brought into camera view a plastic accordion style binder. **MINNI** untied a cord in front of the binder and pulled from the container what appeared to be white cardboard or paper wrapped in clear plastic and enclosing a pliable material. **MINNI** placed the object into the middle drawer of a filing cabinet next to his desk. At 7:33 a.m., **MINNI**, back at his desk, brought into camera view what appeared to be an empty USPS priority mail Tyvek envelope. **MINNI** then folded and again placed the envelope underneath his desk. Continuing at 7:33 a.m., **MINNI** retrieved a roll of clear tape from a previously opened desk drawer and continued to manipulate the unseen item underneath his desk. At 7:34 a.m., **MINNI** reached underneath his desk and brought into camera view a closed, white, USPS priority mailbox, which **MINNI** departed the office with. At 7:35 a.m., CCTV coverage in the vicinity of the Greece Station captured **MINNI** place the white box into or around the same USPS container on the workroom floor the mailing was earlier removed from.

43.    A short while later, at 9:13 a.m., CCTV footage from inside **MINNI'S** office captured **MINNI** holding an empty black and white box. **MINNI** proceeded to open the middle drawer of the filing cabinet located next to his desk and reach inside. **MINNI,** while turned away from the CCTV camera, appeared to remove a white object from the middle drawer and place the item inside the black and white box resting at his feet. **MINNI** then turned in his chair and placed the now-closed black and white box onto his desk. **MINNI** retrieved a roll of clear tape from his desk drawer and sealed the top of the box with a strip of tape. At 9:14 a.m., **MINNI** departed his office carrying the box. At 9:15 a.m., CCTV footage in the vicinity of the GPO captured **MINNI** place the black and white box into the rear compartment of the white Ford F150 Roush. Based upon my participation and knowledge

25

of this investigation, I believe **MINNI** removed a box containing narcotics from the floor of the GPO and took it to his office to repackage, and eventually remove from, the GPO. **MINNI** again exercised caution when handling the box by wearing gloves, manipulating the box on the floor behind his desk, and initially concealing the contents of the box inside a filing cabinet drawer.

44.     Continuing on March 25, 2022, a member of the investigative team reviewed CCTV footage in the vicinity of **MINNI'S** residence. At 12:06 p.m., a male co-conspirator arrived to the home in a gray Dodge Ram pick-up truck. At 12:08 p.m., **MINNI** arrived to the residence in his vehicle. **MINNI** exited the white Ford 150 Roush and removed a black and white box from the rear compartment. The aforementioned box appeared to the be the same box earlier observed in **MINNI'S** office. **MINNI** handed the box to the male subject while standing in the driveway. The co-conspirator secured the box in the rear compartment of his vehicle, before he and **MINNI** walked to the residence. At 12:12 p.m., **MINNI** and the co-conspirator returned to their respective vehicles and departed.

45.     On March 26, 2022, at 7:28 a.m., CCTV coverage in the vicinity of the GPO captured **MINNI** remove, and walk away with, what appeared to be a white USPS priority mailbox from a USPS mail container on the workroom floor. **MINNI** entered his office carrying the white box. CCTV footage from inside **MINNI'S** office showed **MINNI** place the white USPS priority mailbox underneath his desk and out of camera view. At 7:34 a.m., **MINNI** donned work gloves and appeared to manipulate the box while leaning forward in his chair and with **MINNI'S** hands under the desk. At 7:36 a.m., **MINNI** placed a knife or boxcutter type object onto his desk, removed the work gloves, and turned his attention towards his laptop computer as a USPS employee entered the doorway of the office. Shortly

thereafter, **MINNI** departed the office and returned at 7:40 a.m.. At 7:41 a.m., **MINNI** brought into camera view an object which appeared to be enclosed in a clear plastic bag and placed it into the drawer of a filing cabinet to the left of his desk. At 7:42 a.m., after **MINNI** placed a roll of tape and the work gloves into a desk drawer, **MINNI** reached under his desk and brought into camera view a closed USPS priority mail box. **MINNI** departed his office with the box seconds later. At 7:43 a.m., CCTV coverage in the vicinity of the GPO workroom floor captured **MINNI** place the priority mailbox into a USPS container. Based upon my participation and knowledge of this investigation, , I believe **MINNI** removed a box containing narcotics from the floor of the GPO and took it to his office to repackage, and eventually remove from, the GPO. As in prior instances, **MINNI** exercised caution when handling the box by wearing gloves, manipulating the box on the floor behind his desk, and storing contents removed from the box into a filing cabinet drawer. **MINNI** hurriedly ceased all activity and removed his gloves when he was alerted an employee was passing by or near his office.

46.     At 7:48 a.m., CCTV footage from inside **MINNI'S** office captured **MINNI** enter the office carrying an empty brown box and open at the top. **MINNI** reached into the middle drawer of the aforementioned filing cabinet and retrieved the object enclosed in clear plastic. **MINNI** placed the item into the brown box, closed the top, and using a roll of clear tape, sealed the box. At 8:02 a.m., **MINNI** carried the sealed brown box out of his office. At 8:03 AM, CCTV footage captured **MINNI** entering the white Ford F150 Roush while in possession of the brown box before departing camera view.

27

47.     Continuing on March 26, 2022, at 8:07 a.m., CCTV footage in the vicinity of **MINNI'S** residence captured **MINNI** returning home in his vehicle. **MINNI** exited the vehicle with a brown box and took it to his residence.

48.     On April 2, 2022, at 7:24 a.m., **MINNI** and Employee 1 are observed on CCTV footage inside **MINNI'S** office. **MINNI**, sitting in his chair, reached into his front right pants pocket, and removed and untied a clear plastic bag containing a white substance, and subsequently placed the bag onto the office desk. **MINNI** retrieved a plastic straw from his desk drawer and gave it to Employee 1, who sat in a chair opposite from **MINNI**. Employee 1 cut the straw with scissors and removed from his wallet a plastic card similar to that of a credit card. **MINNI** removed from the plastic bag a white powdery substance and placed it in front of Employee 1. **MINNI** re-tied the plastic bag and placed it back into his right front pants pocket. Employee 1 used the plastic card to separate the white powder into two piles, with one pile being formed into a line. Employee 1 leaned over the line of white powder, and using the plastic straw, appeared to ingest the substance through his nasal cavity. Employee 1 swept the remaining white powder from the desk into a small piece of paper, folded it, and placed it into his wallet. **MINNI** and Employee 1 departed the office together at 7:30 a.m. Based upon my participation and knowledge of the investigation, I believe **MINNI** possessed on his person a quantity of narcotics, some of which he provided to Employee 1. Furthermore, the white substance was prepared and used by Employee 1 in a manner consistant with the use of powder cocaine.

## CONCLUSION

49.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that between in or about May 2018 and in or about April 2022, **RALPH MINNI** possessed with the intent to distribute, and distributed marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and conspired with others to possess and attempt to possess with the intent to distribute, and to distribute, marijuana, a Schedule I controlled substance, and 500 grams or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C), and 846.


Brendan M. Boone
Special Agent, United States Postal Service,
Office of Inspector General


Affidavit submitted electronically by email in .pdf format. Oath administered,
and contents and signature, attested to me telephonically pursuant to
Fed. R. Crim. P. 4.1 and 4(d) on April 15, 2022.

HON. MARK W. PEDERSEN
United States Magistrate Judge